Good morning, Counsel, please. Morning, Your Honor. Morning, Your Honors. Morning. My audible. I'm John Cento. I represent the plaintiffs. There are three plaintiffs in this case, Shaw, Ridman, and Koch. And I would like to reserve five minutes for rebuttal. Okay, we'll try to help you. Keep your eye on the clock, though, okay? Thank you. In May of 2010, Fannie Mae asked Experian this question, quote, how do you identify short sales in Experian's data? That was the question. The answer to that question that Experian gave is the key to this case, is the reason why summary judgment should have been denied, it is the explanation for why Fannie did what it did, it is the explanation for the confusion that was caused. Where is this in the record, by the way, what Fannie Mae asked? Sure. Your Honor, this is on ER-139. And your quote is entire, right? There's no other part to it? It's an email. The question in the email is the one I read. And then I'm getting ready to read the answer. So the answer from Experian to that question, how do we identify short sales in Experian's data? The answer is there are no specific, this is a quote, are no specific codes that will specifically identify a short sale condition. That was the answer. Experian's representative, Pat Finneran, then explained, she admitted, instead Experian said its codes, quote, could imply a short sale. That was the answer really in full. And this was in 2010. But didn't they have in 9-68 their explanation and the same definition that you would associate with a short sale? Are you talking about the manual that identifies the, yes. Yes. Yes, Your Honor. There is, the explanation in the manual is, and this is a manual that is meant to define the coding that is used on the output side of the information they send in the credit report. It does say that. The manual is wrong. But you want to hold Experian responsible for something that Fannie Mae did. No, Your Honor. Fannie Mae read Experian's data exactly the way Experian told Fannie Mae to read it, which is, our data could imply a short sale. It might not be a short sale. It's possibly a short sale. The explanation, as Pat Finneran later explained in deposition is, she put it this way. This is ER-169. Experian's coding can only tell you it is probably a short sale. On 171, Ms. Finneran testified that the coding could tell you that it is probably a short sale. But, Counsel, it seems to me you're confusing what we're having to deal with here, which is, did Experian say something that was inaccurate? If you look at Code 9 alone, I get that that might be the case. But when you add 68 to it, which is what I understand was done here, it makes it clear that there was a settlement regarding the property, but that less than all of the amount due was paid. Do you disagree with that? Absolutely. The record that we made, the evidence that we presented, is that the 68 was ambiguous to begin with. But how is it ambiguous? Are you saying that 68 does not mean that there's a settlement for less than the full amount due on the loan? I am saying that the 68 means settled. Means what? Settled. Okay. So when Experian went about collecting the data that ultimately ended up on the credit report, it said to its furnishers, send us a short sale condition using this 68 AU, but it's a 68 code, using this set of coding. But that set of coding means more than just short sale. Okay. I agree with you. Okay. But it doesn't mean foreclosure, because foreclosure is eight and then some code. And if I understand it, your clients are claiming that they were treated as having been foreclosed upon, which barred them for seven years rather than two years. There's nothing that I see in the record that says that what Experian sent indicated that there was a foreclosure. Am I wrong? Your Honor, the inaccuracy, let me try and back into it this way. The inaccuracy we're claiming is the ambiguity. It is the imprecise way in which Experian attempted to report this information. So you're saying they would have to say, in order to meet your believed definition of the law in terms of inaccuracy, is they would have to, of all the things that can happen in connection with a settled claim other than a short sale, they can't say that. They have to say this is a short sale or they're inaccurate. Is that your point? No, Your Honor. This is not my interpretation. This is law that has existed for more than 30 years. Boy, that's a new one. Tell me what the name of the case is. Sure. It's Karopoulos. You think that says that? I know that it does. So here's what Karopoulos does. So the Fair Credit Reporting Act was enacted in 1970, and if you look at the history of the case law, what you'll find is that in about the 80s, mid-80s especially, there were a lot of circuit court opinions that were describing all, kind of ferreting out all the ambiguities in the statute. And the biggest ambiguity in this statute is the meaning of accuracy. The term is not defined by the statute. So by the 80s, mid-80s, you started to have a lot of cases, and this one in particular is from the D.C. Court of Appeals. Karopoulos has been good law in this country, cited in virtually every jurisdiction. We don't have Ninth Circuit law saying what you just said, right? We have. It has been cited by the Ninth Circuit. I don't mean that. I said we don't have any Ninth Circuit law cases issued by our court in our name, right? On this particular point that I'm making? Correct. Correct, Your Honor. Okay. Yes. So, but Karopoulos has been cited by the Ninth Circuit case law. It's been cited in Gorman. Gorman adopted the reasoning of Karopoulos. But Karopoulos has been good law for more than 30 years. It was issued in 1984, and Karopoulos found this. Maximum possible accuracy puts a duty on credit reporting agencies to assure their reports are not overly imprecise. And Karopoulos dealt specifically with this Code 9. That was the finding. Experian and all the other consumer reporting agencies have known for more than 30 years that accuracy requires precision. It must have precision. If you don't have precision, you don't have accurate reporting. And there was no precision here. We have a question of fact on Experian's own testimony that their data is imprecise. It could mean one thing, might mean a short sale, could mean a short sale. But it doesn't mean foreclosure. Sure. You agree? By itself, it does not mean foreclosure. Didn't your client claim that they were treated as having been foreclosed upon? So let me check my time. I think they did. No. Okay. You're financing for seven years. Sure. Here's how it kind of went down, Your Honor. So Fannie Mae in 2010 asked this question, right? So 2010, all these short sales are happening. The objective of Fannie Mae and the other mortgage lenders, mortgage underwriters, is to give these people a break, right? They want to get them back into the mortgage market a little sooner because they had gone through short sale versus foreclosure, whatever. And so Fannie Mae needed to identify short sales with particularity in credit data in order for their automated system to work. And the whole system is really based on this automated processing. If you don't have automated processing, you're really stuck. So they said to Experian, we need to identify this. Experian's decision was to use this ambiguous coding instead of creating an actual short sale code, which they could have done. But instead they used this ambiguous coding. And Fannie Mae, after having asked the question in 2010, how do we identify this information and being told you can't, essentially, is what she told them. They said, well, then we don't know what it is and we're not going to rely on it, and so we're going to kick it out. Now, Fannie Mae did something. Probably they shouldn't have done it this way, and I think this is what the court in the Fannie Mae case found. You should not have done it in this way. But what they did to get that application out of their automated system was to code it as a foreclosure. The testimony from Fannie Mae, though, makes it clear. They didn't actually think it was a foreclosure. They used that as a mechanism to kick it out. Now, is it Experian and the other credit reporting agencies' fault if a third party, in this case Fannie Mae, codes something in a particular way? If you understand the importance of what I just said, it's not the way in which they coded it to get it out. I understand. In this statute, you have to establish willfulness, right? Yes. Is there any evidence of that? No. We don't have to establish willfulness. Well, if you want relief, you do. No. No. Willfulness is required for a 1681N remedy. It's not required for a 1681O remedy. And that's all you're looking for? No. No. Okay. No. I'm confused at what you're looking for, frankly. Okay. There are two remedy provisions under the statute, N and O. N is for willful violations. O is for negligent violations. So you claim this is a negligent violation? We claim we pled both. Okay. Then you have to show willfulness on the one, right? For the N claim, yes. Okay. And have you shown any willfulness? In other words, if this is an ambiguity and you think it's inaccurate, but it doesn't say foreclosure. There's an entirely different code for foreclosure. It's not about foreclosure. And Fannie Mae treats it as a foreclosure. My question to you is, under the statute, is, in this case, Experian responsible for the improper coding of Fannie Mae? Fannie Mae, the evidence that we presented creates a question of fact about whether Fannie Mae did anything wrong. And I would say conclusively, it appears they didn't. Let me finish the story I was just telling. So, again, Experian decides to use this other set of coding instead of an actual short sale code. We have evidence that they could have done otherwise and didn't, but that's what they did. So Fannie Mae decides we're just going to get this kicked out of our system. We don't know what it is. We can't rely on it. It's too imprecise. They called it inconsistent, and they said we've got to kick it out. How are we going to do that? We're going to code it as a foreclosure because a foreclosure coding will cause it to be kicked out. According to the district court, it relied on a district court decision in Bannock. Yes. But according to the district court, the short sales were reported using this code and also providing to Fannie Mae its technical manuals indicating that an account condition and payment status code of 68 meant what it meant. And so the court concluded in light of these facts, defendant could not be expected to anticipate that Fannie Mae would choose to interpret defendant's credit reports contrary to its explicit instructions. The explicit instructions are what is in dispute. We have evidence that the instructions explicit to Fannie Mae were, I just read them to you, there are no specific codes that will specifically identify a short sale condition. At best, this implies a short sale. Those were instructions, too. The manual is not the end-all, be-all. It is not accurate just because experience says it's accurate. Okay? It is not that. That is a tautology, and that's what they're arguing. Even if you maintain that there were inaccuracies, don't you have to show that their procedures were unreasonable in addition to that? No. No. We have to prove an inaccuracy and then the burden shifts to them to prove that their procedures were reasonable nonetheless. But have you, can you show that they're unreasonable in any way, the procedures that experience? Oh, we can, but that's not an issue really before the court. We're not going to save any of your time. It's up to you, but you don't have much left. It's up to you. Oh, I thought I reserved five. Well, you wanted to, but you have to watch the clock. Unfortunately. Oh, did I go over? Full time. It gets back to the willfulness in the statute. Do you want to save any of that? No, let me, I'll just finish. Okay. Go ahead and just finish up. Me too. I'll just finish up because I really want to make this, I want to make sure you understand this point. It's not about whether they reported it as a foreclosure. The inaccuracy is the imprecision. This is Karopolis, and this precision has been a requirement of accuracy for more than three decades, and they ignored that completely, and they gave imprecise coding out to the market, and the market, and Fannie Mae in particular, no surprise that it's only Fannie Mae, by the way, who really had a big problem here. They're the ones that knew the truth. The truth of it is you can't identify a short sale in this data, and that's exactly how they interpreted it. This business about the manual is totally irrelevant. First of all, there's one of many manuals that said nine means settled. The rest of them didn't say anything about it, nothing. So even if you want to say there's one manual that maybe got it right, which it didn't, you have a whole bunch of manuals that got it completely wrong. So there is plenty of evidence of confusion here. There is evidence of confusion from other parties in the industry. It was all over. It was nationwide, this confusion. From your perspective, confusion equals inaccuracy, and that's your case, right? Imprecision equals inaccuracy. Imprecision. Right. If you don't say short sale, you're inaccurate. Not when you can say short sale. The standard is maximum possible accuracy, maximum possible. We presented evidence that accuracy, that they could have been more accurate than they were very easily, and chose not to, ignored that problem for more than three years as the industry complained and asked for a short sale. Even they admitted, once this got to Congress and they had a congressional hearing on it, even they admitted, their own lobbyists went before Congress and said, yes, the industry needs more certain information. They need more precise information. And we're not giving it. And so what we're going to do is create a code that will. That's what they should have done in 2010. Were other companies using short sale? Were they? Any terms describing the transaction as a short sale? Was the word you said confusing? Were other companies? Other credit reporting agencies. Yeah, other reporting agencies. Were they doing what? Using the word short sale. Nobody used the word short sale. Nobody did that. One great piece of evidence that we presented is that if you show the way in which Experian displayed this data to Wells Fargo, you show Wells Fargo its own data, and you say to the Wells Fargo representative, which I did in deposition, can you tell me whether this account resulted in a short sale? The answer is no. They can't. I think we have your point, and your time is up. Thank you, Your Honor. Thank you very much. Counsel, we'll hear from you. Good morning, Your Honors. I'll bet you disagree with him. I disagree in a lot of ways. My name is Adam Weers. I represent Experian. There are two ways, I think me and Mr. Cento are going to need different microphone heights here. There are two independent reasons why this decision should be affirmed. First, the short sales were always accurately reported as mortgage accounts that were paid in full for less than full balance with an account condition of settled. It was always accurate, and accuracy is a complete defense under the FCRA. And that's the definition of a short sale. That's right. That is what a short sale is. Secondly, contrary to what plaintiff just told you, they are only bringing claims for willfulness. There is only a claim under 1681N. They need to meet that heightened burden. And here, under the Safeco case that the Supreme Court issued several years ago, there is simply no room for a finding of willfulness where you have two different district judges digging into this record, finding the reporting accurate. You have the CFPB analyzing it and similarly finding it accurate. There is no reason, there is no room for finding that experience reporting, and that situation was reckless. Here, and in the essentially identical Bannock case that was in front of Judge Gilliam in the Northern District, the plaintiffs had sold their property short. They then applied for mortgages, used Fannie Mae's desktop underwriter, and their applications were rejected. And it said the reason was because there was a foreclosure reporting. They immediately assumed that that was Experian's fault, so they sued Experian. Discovery debunked the theory completely. The problem lay entirely with a glitch in the programming logic that Fannie Mae was using. I ask your opposing counsel whether there was any basis for Experian being responsible for the coding decisions of Fannie Mae. Would you like to respond to that? Yeah, we would. Experian is responsible for its own actions and responsible for reporting accurately. That's what we did here. There's a case out of Texas called Toliver that actually addressed a similar situation. It said a CRA can't be held liable because some third party is misreading its codes. That's what happened, and that's precisely what happened here. Now, as a good corporate citizen, Experian, of course, worked to try to remedy the problem. Right. How long did this go on? This went on for a couple years, and Experian was frustrated, as I think if you dig into the record, you'll see. Explaining to Fannie Mae, look, by treating nines as foreclosures, you are sweeping in all of our short sales. We would never ever, under any circumstance, report a foreclosure with a nine. Fannie was in a situation where they had, apparently back in the early 90s, someone who Fannie is unable to identify had seen a foreclosure coded with a nine. And so they said, well, we better make sure we catch all foreclosures, so they added nine to their definition. Well, it wasn't reported by Experian because Experian can't do it. The system is not set up that way. It could never report a foreclosure with a leading nine. Now, as the CFPB's findings noted, the problem in some ways relates to the use of the tri-merge report because other bureaus report things differently. So Experian worked with Fannie and was trying to correct. Sorry, it relates to what report? The tri-merge report, which is the report Fannie relies on, what's called a tri-merge, which blends the data of all three bureaus. And it can sometimes create different bureaus do things differently. This is one of those instances. Who does that, the tri-merge? There's third-party companies called resellers. So they take all the data from the reporting? They mix them together and they put out a single report. Now. So should Experian have changed their system as soon as Fannie Mae, as soon as they recognized the problem with Fannie Mae? I mean, this took quite some time. And shouldn't they have changed their system fully? You'll note that in the record that was certainly something that was considered. Everyone initially assumed that, well, there must be a problem with the way the data was reported, let's get a new code. But once everyone started to learn the facts, it became abundantly clear that this was solely a problem with Fannie's foreclosure logic. It was simply wrong. The logic was wrong. They fixed it, and the problem's gone. So there was never a problem with Experian's reporting. It took a while to explain that. But once that was explained and Fannie fixed it, everything was resolved. And that's the best solution. Because if Experian and the industry had added a new code, it would have had ripple effects. There's 15,000 companies who use Experian's reports. One of them was treating short sales like foreclosures. Well, if we go and change our entire programming logic because of this, the other 14,999 now have problems. They've got to go change their systems. And there's no reason for it. Do all report using the same codes? Do all. All the reporting companies? The agencies, the different agencies report using similar codes, each have their own technical manuals, and users of their reports will consult those technical manuals. And what they really do is they design a computer system that, I mean, no one's actually looking at a 9. They've got a computer system that's like, hey, we've got a 9 and a 68 coming in at the same time. That's a settled mortgage. That's a mortgage settlement. So Experian here did what I think was exactly the right thing to do. They worked with the industry. They found the source of the problem. The problem was fixed. Now, importantly, had a short sale code been established? Let's say they created a new code, 205, short sale, which I thought was what Plaintiff was arguing, although then I heard him say that was not what he was arguing. But let's say they'd done that. Well, under Experian's logic, that still would map, that still needs an account condition code. And it would be 9, settled. That's the account condition of a short sale. And it still would keep triggering Fannie's computer programming logic flaw, because they're identifying foreclosures by looking, they're ignoring all of the other details of the reporting and they're looking just at this 9. And so it would not have even fixed the problem. You know, when the appellants disputed the credit report, did Experian conduct any reinvestigation with regard to the accuracy of the appellant's short sale? Yeah, they sure did. So firstly, accuracy is a complete defense to a 1681I claim, which is the reinvestigation claim. So that's why that claim was, the court granted a summary judgment. But yes, we did. Each plaintiff wrote in and said, hey, my short sale is being treated like a foreclosure. Can you fix the reporting? Experian reviews it and responded and said, we're reporting everything completely accurately. We've taken a look. We went back and, you know, checked with the lenders. Everything here is correct. One of the plaintiffs even went to the CFPB and lodged a complaint directly there. The CFPB looked at it and said this was accurate. The bottom line, though, Your Honors, is regardless of the intricacies of the reporting, what is unambiguously clear is that Experian's short sale reporting in no way, shape, or form has anything to do with a foreclosure. Anyone looking at that reporting would know right away that that's a mortgage settlement. It is not a foreclosure. This is the 9-68 code, right? Right. And we ask, and you'll see in our papers, we cite, we ask every single mortgage broker that was deposed, well, what is this account that's being reported? Well, that's a short sale. Everyone knew it was a short sale. There is nothing here to remotely suggest a foreclosure, which is what Fannie was identifying them as. And just to, again, comment on a question I asked your opponent, I asked him whether his clients were all claiming that they had been treated as if their property had been foreclosed upon. That's correct, isn't it? It is largely correct. Okay. Mr. Shaw, whose name is First, actually is a mortgage broker himself. He ran his own report just for his own curiosity. Fannie kicked back a foreclosure, but when he actually applied, he used Freddie. Freddie had no problem. Freddie had no problem analyzing Experian's data and correctly identified the short sale. Another, I think, important fact is Plaintiff Ridman. He applied initially prior to Fannie fixing the glitch, and he was denied because they identified the short sale as a foreclosure, applying this flawed logic. After Fannie fixed it, he applied again. Nothing else had changed. His short sale was reporting the exact same way. And I think demonstrating the accuracy of Experian's reporting sailed right through. They identified a short sale, but not a foreclosure because they'd fixed it. Well, at some point, if you are reporting something to a single listener, and that information, although it may, to some objective person, be read one way always, if that is repeatedly being misinterpreted and you know it, at some point, don't you have a duty to change your reporting, just on a theoretical basis? Isn't that the problem? Yeah, I understand your question. I think the answer is no, we don't. It is an objective standard, and the question is, is the reporting objectively accurate? Here, yes. Now, the duty you have as a good corporate citizen, and not a duty under the SCRA, is to do exactly what Experian did. It tried to talk to FANI, it talked to the CDIA, it talked to the CFPB, and eventually the CFPB was able to talk to FANI's FHA, and they were able to convince FANI to change it. So Experian was proactive here. But, to your point, this was just one user. And so what Experian shouldn't do is change its entire programming to accommodate this one user who is doing something clearly wrong. Okay. And so the other users are who? Freddie Mac, Chase Bank, Joe's Cars, someone who's checking someone for employment purposes, someone who's checking for rent, anyone who looks at a credit report ever, are the other users of Experian's credit reports. FANIMAE is just one out of 15,000. There is no evidence in the record anywhere of anyone else having any trouble. It was simply FANI. Now, the last thing I wanted to touch on is the willfulness claim here. I don't see any way a plaintiff can get past the Safeco opinion. Footnote 20 in the Safeco opinion says that a violation, a reading of the statute, could not possibly be objectively unreasonable where the CRA, credit reporting agency, followed, I'm quoting, followed an interpretation that could reasonably have found support in the courts. Well, here we have two different district judges who looked through voluminous records, determined the reporting was accurate. We also have Experian's regulator, the CFPB, digging into this and determining that there is no inaccuracy. So for this to be a willful violation, it would require Experian to say, oh, clearly, CFPB, you're wrong. You're obviously wrong, and I'm going to do something different than what you found. And there's simply no room for a reckless finding here under the evidence that's in this case. One final point I want to talk about, because Mr. Cento spends a lot of time on it, and I want to make sure your honors understand the facts. Ms. Finneran's email that he started his whole argument with was dated 10 years after Fannie had created this imprecise software logic. So the notion that it created this imprecise software logic is simply and demonstrably false. But what she said was exactly right. The coding can imply a short sale, and that's because the industry has collectively decided short sales are one type of mortgage settlement, by far the most common. But there are other very rare circumstances where apparently, and I've never seen one of these in real life, but apparently you can call your mortgage company and say, hey, I want my balance to be $200,000 instead of $300,000, and I will pay that off tomorrow if you agree to those terms and let me stay in the house. Apparently that's possible. People do it. It's still a mortgage settlement, and it's reported the same way. Now, there wasn't a sale, so that's why Ms. Finneran says it could imply a short sale. There are other mortgage settlements. But the industry has decided they should all be coded the same way, and so the notion that that makes it misleading can't follow under Ninth Circuit law. It's not misleading. The industry knows that. The industry knows this is how it's reported. That's all I have, your honors. Okay. Any other questions? No. Thanks to both counsel for your arguments. We appreciate it. The case just argued is submitted.
judges: Schroeder, M. Smith, Drain